Filed 12/10/25  P. v. Moreno CA2/8

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION EIGHT

| | |
|---|---|
| THE PEOPLE, | B336444 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. NA110422) |
| v. | |
| RAYMOND TUI MORENO, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, James D. Otto, Judge.  Affirmed.

Richard D. Miggins, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Idan Ivri and Theresa A. Patterson, Deputy Attorneys General, for Plaintiff and Respondent.

_____

Defendant and appellant Raymond T. Moreno appeals from his conviction for the murder of Joshua Harris. Appellant claims: (1) in violation of *Brady v. Maryland* (1963) 373 U.S. 83 (*Brady*), the prosecution withheld from the defense information that a prosecution witness had received threats on social media; and (2) the court improperly allowed the investigating officer to identify appellant in pixelated surveillance video footage. We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

### 1. The Shooting

On the evening of September 14, 2018, Travis Cockrell and the woman he was dating went to Cristela's Bar on Anaheim Street in Long Beach. Both Cockrell and appellant lived near the bar and belonged to the East Side Longos gang. That evening, Cockrell wore a red shirt (or sweatshirt) and bandana. At the same time, victim Joshua Harris was visiting his friend Leoni Ochoa, whose apartment was within walking distance of Cristela's Bar.

At around 11:40 p.m., Cockrell left the bar to smoke a cigarette. Harris, Ochoa, and another friend were outside the nearby apartment complex. Witnesses testified inconsistently about whether somebody yelled a gang call out, or provocation, along the lines of "fuck Crabs," "fuck Chongos," or "Pobres up." There was, however, no evidence that Harris, Ochoa, or his friend were gang members. Cockrell walked up to the three men and asked whether they "bang," that is, he questioned whether any of them were rival gang members. Harris's friends denied any gang affiliation. Harris, who had been drinking, said he was not a gang member and then appeared to challenge Cockrell to a fight.

2

Cockrell then punched Harris in the jaw, and a brief fistfight between the two ensued.

Appellant arrived on the scene as the fight was ending. He was wearing a black shirt. Appellant put down the bike or scooter he was driving and crossed the street towards Cockrell and Harris. Appellant took a gun from his waist, aimed at Harris, and fired three to four shots. Ochoa and his friend ran towards Ochoa's apartment. As Cockrell's date left the bar to look for him, she heard the gunshots. She saw Cockrell across the street; she also saw appellant in a black shirt, on a bicycle, within 10 feet of Cockrell. Cockrell and appellant then fled towards a park, away from the apartment complex.

Harris died at the scene from a gunshot wound to the chest.

### 2. *The Charges*

The prosecution charged both appellant and Cockrell with first degree murder. Appellant was also charged with a separate count of felony possession of a firearm. Cockrell was additionally charged with aggravated assault and as an accessory after the fact. Various gang and other enhancements were alleged against both men.

Cockrell and appellant had a joint preliminary hearing. Additional charges arising out of a separate incident were later filed against Cockrell in an amended information. The record suggests Cockrell was in custody at the time of appellant's trial after pleading guilty or no contest to some of the additional charges against him, but not for those related to the fight and murder of Harris.

Appellant was thus the sole defendant at trial.

3

### *3. Collection of Evidence*

The police obtained surveillance footage from residences and businesses near the scene.  Video from inside a liquor store located a block from the bar showed appellant in a black hat, black shirt, khaki shorts, and black shoes roughly 40 minutes before the shooting.  The external surveillance videos were grainy or pixelated but purported to show appellant's and Cockrell's relative movements before, during, and after the shooting, and were generally consistent with witnesses' in-court testimony.

The police collected a red bandana from the scene that revealed Cockrell's DNA.  Forensic evidence excluded appellant as a DNA contributor on the bandana.  Law enforcement retrieved three spent bullet cartridges but found no DNA evidence.  The firearm was never recovered.

### *4. Post-Arrest Statements*

The court admitted prosecution evidence of several post-arrest statements from appellant and Cockrell.  Cockrell had previously asserted his Fifth Amendment right against self-incrimination and was found unavailable for hearsay purposes.

The two men were arrested separately, initially on unrelated charges.  On one occasion, law enforcement placed an undercover informant in Cockrell's cell with a recording device.[1]  In the recording introduced at trial, Cockrell discussed fighting a man because the man "dissed the hood" yet "didn't even bang."  Cockrell described how he went outside to smoke a cigarette, heard a gang call out, confronted the man, and began fighting

---

[1]     This investigative tactic is known as a Perkins Operation after the Supreme Court approved the procedure in *Illinois v. Perkins* (1990) 496 U.S. 292.  (See *People v. Foster* (2021) 61 Cal.App.5th 430, 434 & fn. 1.)

4

him. "Right after he got handled, fool, I took off. And I look back in the distance, and I see my homie from – come – come behind me, you know. He was already [inaudible] . . . He came like Superman . . . He clean – cleaned shit up." In an apparent reference to "my homie," Cockrell then identified the other man by his gang name, Malo, and described the tattoo Malo had on his face. (Witnesses at trial confirmed appellant's gang moniker as "Malo" and also described his tattoo. Witnesses also testified that Cockrell's gang name was "Mars.")

After appellant's arrest, law enforcement placed appellant and Cockrell in nearby cells with a recording device. Played for the jury were recordings in which appellant made several incriminating statements. Appellant asked Cockrell whether the police had shown him video evidence from "when that fool got dropped?" Cockrell responded, "Who, the dark skinned one?" (Victim Harris was a Black man.) Cockrell explained he had seen "a video of us taking off" but believed there was also a video from the "main scene."[2] Later in the recording, appellant asked Cockrell whether the video showed his tattoos. Cockrell replied no, "but what gives it up is what we were wearing." Cockrell later asked appellant whether firearms had been cleaned from "you know what day I'm talking about." Appellant responded that "it's been gone," while the other gun was clean, presumably meaning without fingerprints.

The court also admitted in evidence a note that appellant tried to have another inmate deliver to Cockrell while both were in custody. Law enforcement had intercepted the note. The note

---

[2] The investigating officer testified that law enforcement had not shown Cockrell any of the surveillance videos.

5

asked Cockrell for help: "You didn't shoot him. Do you understand me? Now, what I wanted to ask you if you could and you can help me by telling your attorney that you for sure know that I'm not the shooter. You don't know the shooter. You saw him for sure. It's not me. They making [*sic*] a mistake. So let me know what you think." At trial, the investigating officer read the complete note to the jury. The transcript of the officer's reading is reproduced in the margin. The italicized and bracketed language appears to be an explanatory statement the officer made for the jury's benefit and was not part of the note.[3]

---

[3]  "My brother M. My love and respects to you, solid homie. I hope all is good with you and your love – and your loved ones. I'm all right over here. So no need to trip, my Longero Viejo. Look, I'm trying to come up with a safe way to communicate with you. . . So we can be on the same page and win over this bullshit ass case. So Tripp, my G. I looked into this new law called. Basically they cannot charge you for this hot one, no matter if you were there. You are not the one who did it. So that's why we need to work this out the smart way. For example, they can only give you 5 years max. That's it, and that's good news just because you get into it with that guy. You didn't shoot him. Do you understand me? Now, what I wanted to ask you if you would and you can help me by telling your attorney that you for sure know that I'm not the shooter. You don't know the shooter. You saw him for sure. It's not me. They making a mistake. So let me know what you think. Be careful when you send me mail. We gotta be careful and stay solid. Watch who we talk to. People talk a lot. So you know we don't like them kind. Look where they got us already. But we gonna be good. Just don't tell no one, not even the homies from the hood. On your wila – [*a wila in Spanish gang culture is like a letter, a note, a message. It's essentially a kite*]. Don't say nothing. I'll get at you personally or take the mail straight to you or at least close to you. I love you,

### 5. *Eyewitness Testimony at Trial*

At trial, the prosecution called five eyewitnesses, who testified as follows:

**Leoni Ochoa**:  Ochoa had known Harris for roughly eight years.  On the day of the shooting, Ochoa asked Harris, who seemed depressed, to spend time with Ochoa at his apartment in an effort to cheer up Harris.  Harris seemed despondent much of the time while in the apartment.  Ochoa told the jury how a Hispanic man in a red shirt and a red bandana around his neck approached Ochoa, Harris, and another friend when the three of them were outside Ochoa's apartment.  The man in red asked whether the three of them banged, and Ochoa and his other friend said no.  Harris said, "I don't bang, but if you'd like you can catch these hands."  The man in red said he was from East Side Longos.  The man in red punched Harris, and the two fought for 15 seconds.  After that, another man who wore a black shirt and black hat approached on a bicycle, jumped off, pulled a handgun from his waist, aimed at Harris, and shot him.  Ochoa recalled four shots.

At trial, Ochoa identified appellant as the shooter.  He estimated he saw the shooter for less than 10 seconds.  It was dark at 11:42 p.m., but the fight occurred directly under a streetlight and nothing blocked Ochoa's view.  Ochoa testified he

---

my G.  I'm a full East Side – in full East Side Longo fashion way, don't forget our doubt – or doubt me.  If you get loose from this shit, I will make sure you are tooken care of for sure.  You don't have to tell your attorney that I was there, just that it's not me and we'll figure the rest out.  Hit me back up so I know you got this wila and that you okay.  [¶] . . . [¶]  Let me know you got this wila, and after you read it, toes it in the – toss it in the toilet ASAP.  L's or shells."

did not identify appellant from a photographic lineup when interviewed by the police after the shooting. He also said that he did not recognize appellant by his facial tattoos. Instead, he saw appellant "from the right side of his face" and "can remember the facial structure without the tattoo, from that [*sic*] seconds I had."

**J.L.:**[4] J.L. was the witness who said she had been threatened. She had testified at the preliminary hearing four years before the trial that Mars (Cockrell), who wore a red hooded sweatshirt, fought the victim and that another individual, who wore a black sweater, shot the victim. When the prosecution called J.L. on the first day of trial, she changed her earlier testimony to: As she walked to a nearby liquor store, she heard something, turned around, and saw two men come towards her side of the street. She recognized one of the men as Mars, who wore a red hooded sweatshirt. She then saw the victim as he was shot. She saw Mars with a gun. At that point in her testimony, the prosecutor apparently sensed some discomfort in J.L.'s voice and asked if she was afraid. J.L. said "yes" and, when asked why, responded, "because I got threats made." The prosecutor requested a recess, and the court adjourned for the day. Outside the presence of the jury, the parties agreed that the People knew about threats but had not disclosed them to the defense.[5]

---

[4] We refer to J.L. by initials because she was a minor at the time of the shooting.

[5] The prosecutor took "responsibility" and told the court, "but at that point, without the context of what the message was or this threat of Jenny, I did not turn it over to [defense counsel]." We find the excuse that the prosecutor needed further context in order to disclose the threat to the defense, but did not follow up for that context, unconvincing.

8

The next day began outside the presence of the jury with J.L. testifying about the threats she had received.[6]  Appellant moved for a mistrial based on the prosecution's earlier nondisclosure of the threats.  The court denied the motion.  The court admonished J.L. not to volunteer information about the threats because the attorneys were not planning to ask about the subject.  There was no further testimony about the threats.

J.L. then resumed her testimony before the jury.  She saw Mars and the other man punching and kicking the victim.  "Mars and the other guy [had] pulled back towards the middle of the street," and "that's when I saw Mars shoot the guy."  The prosecution then confronted J.L. with her previous statements to law enforcement that Mars was not the shooter, but J.L. testified she did not remember telling law enforcement that (1) the other individual – not Mars – was the shooter; (2) she never saw Mars with a gun; and (3) she saw the other individual drop his scooter, run up, and shoot the victim.  J.L. then testified that the person wearing black pulled out a gun, but Mars was the shooter "if I remember correctly."  The prosecution again brought up J.L.'s prior statements to the police, and this time J.L. acknowledged that she had told the officer that Mars was the fighter, and the other person wearing a black sweater was the shooter.  Later when the prosecutor again referred to her previous statements to law enforcement, J.L. testified that the man on the bicycle in the black sweater was the shooter.  She could not recall whether Mars had any weapons.  "It plays different in my head.  It's been five years. . . .  He sat the bike down across the street on the

---

[6]    We recount this proceeding in more detail in Part I.C of the Discussion section.

9

corner, on the curb.  He ran across.  It's all kind of a blur from there."

After a recess, the prosecution asked J.L. about the three different sets of statements she had given:  (1) her trial testimony, (2) her prior interview with the police, and (3) her prior preliminary hearing testimony.  J.L. then testified that she saw Mars in a red hooded sweatshirt run up to and beat up the victim.  The victim was with two other people.  The victim fell to the ground, and Mars stepped back onto the street.  "That's when the other guy came from the corner and shot – shot [the victim] as [the victim] was standing up."  The prosecutor then asked: "The guy that was coming across the street, what was this individual wearing?"  J.L. answered:  "I just remember a black sweater."

On cross examination, J.L. described her then-present thinking this way:  "Now I see it different.  Like, I don't know if it's my, like, just trying to fill in the blanks.  But I do remember, like, going over the phrases, we just went.  It does bring back memories of him shooting, the one in the black sweater shooting the victim."  J.L. did not identify Moreno in court as the man in the black sweater.

**Sandra Torres**:  Torres is J.L.'s sister and Ochoa's neighbor.  On the night of the shooting, Torres, J.L., and other family members were outside the apartment complex where both Torres and Ochoa lived.  While J.L. walked to the nearby liquor store, Torres was talking with Harris, and "two [*sic*] appears, came across the street and started blasting him."  Torres then described that the victim was en route to the liquor store "when they caught up to him and he started shooting at him."  Torres was scared, ran back, and "didn't see the second person" or

10

remember anything about what he was wearing.  The person in the hooded sweatshirt was punching the victim, and the fight lasted seconds.  The fighter was Mars: "I'm pretty sure, yes. He had a hoodie on, and that's the only person I can testify because that's the only person that I seen that looked like the guy that I know from where I am living at."

Torres was approximately five feet from the fight when it happened.  It was dark and she did not see anyone make motions to get a gun, but heard the gunshots.  Torres did not see the other man with a gun, she just heard gunshots.

Torres gave two prior statements to law enforcement, one on the night of the shooting and the other during an interview the following month.  The prosecution confronted Torres with her prior statements, and she adopted the following version of events: Mars was the fighter, he wore a red hooded sweatshirt with khaki, and he said "East Side Longo" before the fight.  The other person with Mars was on a bike and wore a black shirt and khaki shorts.

At one point in her testimony, Torres said that both Mars and the other individual had a gun.  By the end of her direct examination, she testified consistently with her prior statements to law enforcement that the man on the bicycle who wore a black shirt was the shooter, and Mars was the fighter.  The shooter fired approximately five times.  Mars and the shooter left towards a nearby park.

On cross examination, Torres testified that she heard someone say, "Fuck Crabs."  She both heard and saw the shots, did not look at the shooter's face, and did not see any tattoos on the shooter.  She testified she had three or four beers on the night

11

of the shooting, but J.L. had not been drinking. By the time of trial, Torres had been sober for approximately five months.

The prosecution did not ask Torres to identify appellant as the shooter.

**Angela Zelaya**: Zelaya was Cockrell's date the evening of the shooting. She was a prosecution witness. Zelaya testified that Cockrell and appellant lived in the same neighborhood. On the night of the shooting, she and Cockrell went to Cristela's Bar. Cockrell wore a red shirt and a red bandana. At one point, Cockrell walked out of the bar to smoke a cigarette. A few minutes later Zelaya went outside to look for him. As she exited the bar, she heard gunshots. She then saw Cockrell across the street. Appellant, whom she identified in court as "Malo," was wearing a black shirt and was on a bicycle near Cockrell. Appellant and Cockrell were roughly 10 feet apart. After Zelaya crossed the street and spoke with Cockrell, the two men ran. She did not see who shot Harris.

**Carlos Guzman**: Guzman was at home when he heard people arguing. He heard two to three gunshots. After ducking to cover, he looked out his window and saw two people leaving around the corner; one person left on a bike or scooter. He could not see the runners' faces, races, or genders. Nor could he describe their clothing.

### 6. *Gang Evidence*

A Long Beach police officer testified as a gang expert and stated that the location of the shooting was disputed territory between the Hispanic East Side Longos and the Barrio Pobre gangs. He testified that a member of the East Side Longos who heard "Pobres up" would take that as a challenge to fight. Crips, a black gang, was also active in the Long Beach area. Hispanic

gang members in Long Beach would assume Black men in their territory were members of a Black gang. The officer testified that he would "expect" Hispanic gang members in the area to yell "Fuck Crabs" to a Black man in Longos territory.

### 7. *Verdict, Sentence, and Appeal*

The jury found appellant guilty of first-degree murder, an enhancement for personally and intentionally discharging a handgun resulting in Harris's death, and of possessing a firearm as a convicted felon. (Pen. Code, §§ 187, subd. (a), 12022.53, subd. (d), 29800, subd. (a)(1).)[7] The court sentenced appellant to an indeterminate 50 years to life for the murder and firearm enhancement, and an additional determinate eight-month consecutive term for possessing a firearm. Appellant timely appealed.

## DISCUSSION

## I. There Was No *Brady* Violation
### A. Appellant's Contention

Appellant complains that the prosecution knew its "key witness" had received threats on social media before trial yet withheld that information from the defense. Approximately two weeks before trial, J.L. received messages on social media that J.L. perceived as threatening. She told the investigating officer about the messages and sent the officer a screenshot of one sender's social media profile. The investigating officer then told the prosecutor. Yet the prosecution failed to disclose that information to the defense; instead, the defense learned of the

---

[7] Further undesignated statutory citations are to the Penal Code.

13

threats when J.L. testified about them at trial in response to a prosecutor's question.

Considering both the arguments made at trial and those asserted on appeal, it appears appellant contends there were actually two errors arising from the failure to disclose the threats made to J.L.: a *Brady* violation and a state law discovery violation.[8]

### B. Legal Principles: Evidence Favorable to the Defense, Suppression, and Prejudice

" 'Under *Brady*, . . . and its progeny, the prosecution has a constitutional duty to disclose to the defense material exculpatory evidence, including potential impeaching evidence.' " (*In re Jenkins* (2023) 14 Cal.5th 493, 504, quoting *People v. Superior Court* (*Johnson*) (2015) 61 Cal.4th 696, 709.) The prosecutor has a duty to learn of favorable evidence that the police obtain, and the *Brady* rule extends to evidence that the police know but the prosecutor does not. (*Strickler v. Green* (1999) 527 U.S. 263, 280-281 (*Strickler*).)

" 'There are three components of a true *Brady* violation: The evidence at issue must be favorable to the accused, either because it is exculpatory or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued.' " (*People v.*

---

[8] The People agree appellant's *Brady* claim has not been forfeited despite defense counsel's failure to mention "*Brady*" in her motion.

California's Criminal Discovery Act is found in Penal Code sections 1054 et seq.

*Salazar* (2005) (*Salazar*) 35 Cal.4th 1031, 1043, quoting *Strickler*, *supra*, 527 U.S. at pp. 281-282, fn. omitted.)

"Prejudice, in this context, focuses on 'the materiality of the evidence to the issue of guilt and innocence.' [Citations.] Materiality, in turn, requires more than a showing that the suppressed evidence would have been admissible [citation], that the absence of the suppressed evidence made the conviction 'more likely' [citation], or that using the suppressed evidence to discredit a witness's testimony 'might have changed the outcome of the trial' [citation]. A defendant instead 'must show a "reasonable probability of a different result." ' [Citation.]" (*Salazar*, *supra,* 35 Cal.4th at p. 1043.)

For our purposes, analysis for *Brady* error and prejudicial delayed disclosure under state law is the same. (*Salazar*, *supra*, 35 Cal.4th at p. 1043 [*Brady* prejudice requires showing reasonable probability of different result]; *People v. Mora and Rangel* (2018) 5 Cal.5th 442, 468 [prejudicial statutory violation requires reasonable probability of different result "had the evidence been timely disclosed."].) So too is the test for delayed disclosure under *Brady*: "Evidence actually presented at trial is not considered suppressed for *Brady* purposes, even if that evidence had not been previously disclosed during discovery. . . . [W]hen considering whether delayed disclosure rather than 'total nondisclosure' constitutes a *Brady* violation, 'the applicable test is whether defense counsel was "prevented by the delay from using the disclosed material effectively in preparing and presenting the defendant's case." ' " (*People v. Mora and Rangel*, at p. 467 [no prejudice found either under *Brady* or state law].)

On appeal, the defendant must establish each element: favorability to the defense, suppression, and prejudice.

15

We independently review whether a *Brady* violation occurred (*Salazar*, *supra*, 35 Cal.4th at p. 1042) and review a trial court's discovery rulings for an abuse of discretion (*People v. Mora and Rangel*, *supra*, 5 Cal.5th at p. 466).

## C. Trial Court Proceedings Related to *Brady* Error

During the prosecution's case-in-chief, J.L. testified – contrary to her preliminary hearing testimony – that she saw Mars (Cockrell) with a gun on the night of the shooting. Apparently from either her deportment or the change in testimony, the prosecutor then asked J.L. whether she was concerned or afraid. J.L. responded that she was, and the prosecutor asked why. J.L. replied "because I got threats made." The prosecutor asked for a recess, and the court dismissed the jury for the day.

The next morning, outside the presence of the jury, J.L. testified about the threats she had received. A man named Lucky sent J.L. a message on social media that asked, "what's up?" J.L. received the message approximately two weeks before trial and called the investigating officer because the timing was suspicious. J.L. told the investigating officer that the same person had messaged her around the time of her preliminary hearing testimony, which had occurred almost four years before trial, and asked what she had said in the courtroom. She deleted the messages and blocked the sender's account. She also sent the investigating officer a screenshot of the sender's account profile. The investigating officer called the prosecutor and relayed this information.[9]

---

[9] J.L. received a third threat from her cousin's girlfriend who apparently was at the preliminary hearing. That person said "something like watch what's going to happen for snitching on

16

The defense moved for a mistrial based on a discovery violation, which the court denied. The court found neither an intentional discovery violation nor substantial prejudice because it appeared that J.L. had changed her testimony in a way that potentially benefitted appellant. The court's view was: "it goes, frankly, to what I began to see as her changing her testimony somewhat. Interestingly enough, earlier you said – and I think it may have been off the record – that her – any intimidation was with respect to Mars and not your client. But interestingly her testimony, which was a surprise based on what she had said before, I believe, was that Mars pulled out a gun. . . . Didn't say he shot the gun but said he pulled out a gun. That in itself for a convicted felon is a crime. So I have a hard time seeing that there's been any real substantial prejudice here one way or the other." The court stated the information probably should have been disclosed, but it did not merit a late discovery instruction.[10]

The parties then stipulated that the threats J.L. received were not attributable to appellant, and the court would so instruct the jury. The prosecutor also agreed not to elicit further testimony about the threats.

Mars [Cockrell]." J.L. did not disclose that threat to the investigating officer before trial.

[10] CALCRIM No. 306 allows a jury to consider any effect of a late discovery disclosure when "evaluating the weight and significance of that evidence." The Bench Notes caution that "the court should not give this instruction unless there is evidence of a prejudicial violation of the discovery statute." (CALCRIM No. 306 Bench Notes, p. 82.)

17

J.L. then resumed testifying before the jury. While her memory was spotty and her statements often contradictory, she ultimately testified consistent with the prosecution's theory of events: she was walking by the area when the shooting occurred; she knew and recognized Cockrell, who wore red; she saw Cockrell fight the victim; and she saw someone wearing a black shirt get off a bicycle and shoot the victim. She did not see the shooter's face and could not identify appellant in court. At the close of evidence, defense counsel read the following stipulation to the jury: "There is no evidence that [appellant] Raymond Moreno knew about, directed, or made the threats that [J.L.] testified to receiving." The court also instructed the jury "not to consider for any purpose the alleged threats testified to by [J.L.]."[11]

## D.  The Evidence Was Favorable to Appellant and Not Disclosed Before Trial

" 'For *Brady* purposes, evidence is favorable if it helps the defense or hurts the prosecution, as by impeaching a prosecution witness.' " (*People v. Verdugo* (2010) 50 Cal.4th 263, 279.) "Proof of bias is almost always relevant because the jury, as finder of fact and weigher of credibility, has historically been entitled to assess all evidence which might bear on the accuracy and truth of a witness' testimony." (*United States v. Abel* (1984) 469 U.S. 45, 52.) "Under *Brady*, 'the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the

_____

[11]  On appeal, the People do not argue appellant waived *Brady* error by agreeing to the court's instruction.

18

prosecution.' " (*People v. Mora and Rangel*, *supra*, 5 Cal.5th at p. 466, quoting *Brady*, *supra*, 373 U.S. at p. 87.)

Because evidence of threats could have affected how the jury viewed J.L.'s testimony, we conclude the discovery violations were favorable to appellant under both *Brady* and state law.

As for the requirement that the evidence had been suppressed, we observe that the briefing sometimes confuses the analysis as to total suppression and delayed suppression. There is, however, no debate that the information was not disclosed until trial. The parties agree that the real question is whether appellant was prejudiced, an issue to which we next turn.

### E.  Appellant Was Not Prejudiced

To establish prejudicial error under both *Brady* and state law, appellant must show that it was reasonably probable the jury would have reached a different result had the evidence been timely disclosed. (See *People v. Mora and Rangel*, *supra*, 5 Cal.5th at pp. 466-468; *Salazar*, *supra*, 35 Cal.4th at p. 1043.)

On appeal, appellant provides two examples of what his trial counsel would have done differently if she had known of the information earlier: she could have discussed the subject of threats with prospective jurors during voir dire, and she could have brought a pretrial motion to limit J.L.'s testimony. We find this vague assertion, devoid of specifics of what counsel expected to accomplish, is insufficient to establish prejudice. "A defendant who claims that his hand was prematurely forced by delayed disclosure cannot rely on wholly conclusory assertions but must bear the burden of producing, at the very least, a *prima facie* showing of a plausible strategic option which the delay foreclosed." (*United States v. Devin* (1st Cir. 1990) 918 F.2d 280, 290.) Appellant's brief makes no effort to explain exactly what

19

the defense would have done if the threats had been disclosed before trial. Nor does appellant attempt to explain how earlier disclosure of the threats would likely have made J.L.'s testimony more favorable to appellant. Finally, as the People point out in the respondent's brief, once the threats were discovered, "defense counsel did not ask the court for additional time to investigate the source or impact of the threats." Appellant did not file a reply brief, nor did he anticipate and counter the People's argument in his opening brief.

Most persuasive to us is the stipulation proposed by the defense, accepted by the People, and read to the jury. The stipulation was there was "no evidence that [appellant] Raymond Moreno knew about, directed, or made the threats that [J.L.] testified to receiving." The stipulation was straightforward and left no room for doubt. The stipulation, once read to the jury, negated whatever prejudice may have flowed from the delayed disclosure. It cleared up any possible misconception that appellant had threatened J.L. Although the jury had been instructed to ignore evidence of the threats, if the jury had disobeyed the admonition, the only inference it could make from the stipulation was that it was Cockrell (Mars), not appellant, who had threatened J.L. If Cockrell had threatened J.L., the jury could infer that it was Cockrell who was the shooter not appellant. Given the stipulation and J.L.'s inconsistent testimony on the witness stand, we cannot say that, with earlier disclosure, the defense would likely have elicited more favorable testimony from J.L. Accordingly, we conclude that it was not reasonably probable that appellant would have received a more favorable verdict if the threats had been timely disclosed.

## II. Any Error in the Admission of the Officer's Identification of Appellant from the Video Was Harmless

During the prosecution's case-in-chief, the district attorney introduced surveillance video footage showing events before, during, and after the shooting. The investigating officer testified that one video showed a person the officer believed was appellant. The officer then clarified that he could not identify appellant from the video alone and that he was investigating the identity of the person depicted in the video. The officer did not call appellant by name when he testified about other external surveillance videos. He instead referred to the individual as the "subject," "male subject riding a bicycle," "a figure," "the individual," or "a figure consistent with someone riding a bicycle."

Appellant argues the trial court should not have allowed the investigating officer to identify appellant because the officer did not testify to any prior personal knowledge to enable him to make that identification from the video. The People respond that the investigating officer did not offer opinion identification testimony but instead testified as to his belief based on the totality of his investigation. Alternatively, the People claim any error was forfeited and harmless. We need not discuss the first two points made by the People because we hold that any error was harmless given the other evidence of appellant's guilt. (*People v. Watson* (1956) 46 Cal.2d 818, 836; *People v. Gallardo* (2017) 18 Cal.App.5th 51, 76.)

Appellant has not shown "it is reasonably probable the outcome would have been more favorable" to appellant had the officer's fleeting testimony been excluded. (*People v. Carter* (2005) 36 Cal.4th 1114, 1152.) The officer immediately clarified

that he could not identify appellant from the surveillance video alone. The videos were played for the jury, who could independently determine whether or not they showed appellant. Other evidence the prosecution introduced compellingly showed appellant's guilt. Ochoa identified appellant as the shooter. Although J.L. and Torres testified to different versions of events at trial, they both eventually adopted their prior statements to law enforcement that Cockrell (Mars), who wore red, was the fighter and the other man, who wore black, was the shooter. Other witnesses confirmed what the shooter and the other man were wearing. Zelaya, Cockrell's date, placed appellant near Cockrell immediately after the shooting. Cockrell's post-arrest statements referred to appellant as the "homie" who "cleaned shit up." Finally, appellant's post-arrest attempt to convince Cockrell to change his testimony to benefit appellant suggested consciousness of guilt. Considering the entire record, we find that appellant has not shown a more favorable outcome was reasonably probable absent the officer's testimony.

## III. Appellant Is Not Entitled to Additional Custody Credits

Appellant requests an additional 13 days of custody credits. He arrives at this number by counting back from the date of his sentencing hearing to that of his custodial interview. The People do not challenge the math but instead contend that appellant has not established he was in custody for the instant offense at the time of that interview. Again, appellant filed no reply brief.

Appellate courts may make computational corrections to presentence custody credits. (See *People v. Turrin* (2009) 176 Cal.App.4th 1200, 1205 ["sentencing court's computational error resulting in an unauthorized sentence can be corrected at any

22

time."].)  The appellant must first establish that the sought credit "is attributable to proceedings related to the same conduct for which the [appellant] has been convicted."  (§ 2900.5, subd. (b).)

Appellant has failed to make the requisite showing of error.  As he concedes, the record does not show when appellant was arrested for Harris's murder.  The record does, however, establish that he was in custody facing separate weapons charges on the day of his custodial interview, as both the investigating officer and defense counsel told the court.  The interview transcript, taken as a whole, confirms this.  On this record, appellant has not demonstrated that he was in custody for "the same conduct for which [he] has been convicted" on an earlier date than the trial court calculated.  (§ 2900.5, subd. (b).)  We find no error.

**DISPOSITION**

The judgment is affirmed.


RUBIN, J.*

We Concur:



WILEY, Acting P. J.



VIRAMONTES, J.

---

\*      Retired Presiding Justice of the Court of Appeal, Second Appellate District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.


23